**UNITED STATES of America,**

v.

**Arthur L. PIMENTAL and Loretta R. Pimental, Defendants.**

**No. CR. 99–10310–NG.**

United States District Court, D. Massachusetts.

Feb. 20, 2001.

Mark J. Balthazard, United States Attorney's Office, Boston, MA, for U.S.

Harvey R. Peters, Peters & Moscardelli, James C. Rehnquist, Goodwin, Procter & Hoar, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER RE: RECONSIDERATION OF DISCOVERY RULINGS*

GERTNER, District Judge.

Defendants Arthur L. Pimental and Loretta R. Pimental ("the Pimentals") are charged with one count of conspiracy, in violation of 18 U.S.C. § 371, and fourteen counts of mail fraud, in violation of 18 U.S.C. § 1341. The Pimentals have moved for dismissal of the indictment on various grounds. I held a hearing on the motion to dismiss on September 7, 2000. At the conclusion of the hearing, I took the motion under advisement pending the resolution of the Pimentals' related motion for discovery, which was then still pending before the Magistrate Court.

On September 25, 2000, the Magistrate Court denied all but one of the Pimentals' requests for discovery. They now move for reconsideration of portions of the Magistrate Court's rulings on discovery. Their numerous discovery requests seek information defendants believe will support their motion to dismiss.

For the reasons stated below, the Pimentals' motion [docket # 49] is **GRANTED** as to their Rule 6(e) request (i.e., discovery request number one), but **DENIED** as to their remaining requests. The government is **ORDERED** to produce the Rule 6(e) discovery by **March 16, 2001.** If necessary, the Pimentals shall file supplementary briefs in support of their motion to dismiss no later than **April 6, 2001.** The government has until **April 20, 2001** to file a reply brief.

## I. BACKGROUND

### A. The Defendants

The Pimentals are a husband and wife team who own a steel business. The government alleges that the Pimentals made false statements to their insurers about the type of work their employees performed in the steel business. For example, the government contends that the Pimentals falsely informed insurers that the Pimentals' employees erected concrete structures when, in fact, the employees erected steel structures. The government also claims the Pimentals under-reported employee salaries. Through means of these misrepresentations, the government alleges, the Pimentals reduced their workers' compensation premiums, thereby defrauding insurers of hundreds of thousands of dollars.

### B. The Investigation

On September 29, 1999, a federal grand jury indicted the Pimentals on one count of conspiracy, in violation of 18 U.S.C. § 371, and fourteen counts of mail fraud, in violation of 18 U.S.C. § 1341. The investigation leading up to the indictment, the government admits, was carried out jointly by the Federal Bureau of Investigation ("FBI") and the Insurance Fraud Bureau of Massachusetts ("IFB"). Indeed, the government acknowledges that the IFB performed the preliminary investigation into this matter and ultimately referred the case to the United States Attorney's Office ("USAO") for prosecution.

#### 1. The Insurance Fraud Bureau

By way of emergency legislation in December 1996, the Massachusetts legislature authorized two private voluntary associations of Massachusetts insurance carriers, the Automobile Insurance Bureau of Massachusetts ("AIB") and the Workers' Compensation Rating and Inspection Bureau ("WCRIB") of Massachusetts,[1] to create an insurance fraud bureau "for the prevention and investigation of fraudulent insurance transactions." Mass. St.1996, ch. 427, § 13. The AIB and WCRIB, in turn, created the IFB pursuant

---

1. The AIB is licensed under Massachusetts General Laws chapter 175A, section 8. The WCRIB is licensed under Massachusetts General Laws chapter 152, section 52C.

to that authorization. *Commonwealth v. Ellis,* 429 Mass. 362, 708 N.E.2d 644, 646 (1999) [hereinafter *"Ellis "*].

The IFB is governed by a board of fifteen members, five from the governing committee of each rating bureau and five public officials.[2] Mass. St.1996, ch. 427, § 13(a). The AIB and the WCRIB provide all of IFB's funding, which is borne equally by the two private insurance bureaus. Mass. St.1996, ch. 427, § 13(c). The legislation authorizes IFB personnel to gain access to various information and records, if relevant to an IFB investigation and if used solely for IFB purposes, such as Department of Revenue records and certain criminal offender record information. Mass. St.1996, ch. 427, § 13(d).

Every insurer "having reason to believe than an insurance transaction may be fraudulent" must advise the IFB of the matter. Mass. St.1996, ch. 427, § 13(e). "Whenever IFB's executive director is satisfied that a material fraud, deceit, or intentional misrepresentation has been committed in an insurance transaction," the executive director "shall refer the matter to the attorney general, the appropriate district attorney or the United States attorney" for prosecution. Mass. St.1996, ch. 427, § 13(h).

### 2. *IFB's Involvement in Grand Jury Proceedings*

During the Pimental investigation, the USAO filed an ex parte motion on the District Court's Miscellaneous Business Docket ("MBD"). The motion sought the District Court's leave to disclose grand jury materials "to outside experts assisting" the Pimental investigation, namely, IFB investigators and data analysts. The request was made pursuant to Federal Rule of Criminal Procedure 6(e)(3)(A)(ii) ("Rule 6(e)"), which authorizes disclosure to "such government personnel (including personnel of a state or subdivision of a state) as are deemed necessary by an attorney for the government to assist an attorney for the government in the perfor-

mance of such attorney's duty to enforce federal criminal law." The government disclosed to the District Court that IFB "is a state-chartered, privately funded, investigative entity, established by the Automobile Insurance Bureau of Massachusetts and the Workers' Compensation Bureau of Massachusetts pursuant to a grant of authority from the Massachusetts Legislature." Judge Saris summarily granted the government's motion, signing a form order proposed by the government.

Consequently, IFB employees had some (as yet undetermined) access to grand jury materials and influence on the grand jury. For instance, IFB investigators helped the USAO present the case to the grand jury. Scott S. Faragi ("Faragi"), a criminal investigator employed by IFB, was one of the four witnesses who appeared before the grand jury. In fact, Faragi's testimony comprised the bulk of the testimony heard by the grand jury.[3] Prior to convening the grand jury, Faragi had interviewed each of the other three witnesses who testified.

### C. *The Motion to Dismiss the Indictment*

After learning of IFB's extensive involvement in the investigation and other facts, the Pimentals moved to dismiss the indictment against them. The motion to dismiss makes four arguments: (1) The government violated Rule 6(e) by disclosing secret grand jury materials to privately-funded, non-governmental investigators from the IFB; (2) IFB's role in the investigation and prosecution violates the Pimentals' right to a disinterested prosecutor; (3) IFB investigators violated Massachusetts law by misrepresenting themselves as state law enforcement officers to witnesses IFB interviewed; and (4) the federal prosecution violates the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), because the federal mail fraud statute provides harsher penalties than corresponding Massachusetts

---

**2.** The public officials are: (1) The Secretary of the Executive Office of Public Safety; (2) the Director of Labor and Workforce Development; (3) the Registrar of Motor Vehicles; (4) the Commissioner of Insurance; and (5) the Commissioner of the Department of Industrial Accidents.

**3.** Faragi's testimony covers 126 pages of the 204–page grand jury transcript.

statutes prohibiting insurance fraud, thereby invalidating, impairing, or superseding a state law regulating the insurance industry.[4]

## D. *The Motion for Discovery*

The Pimentals also sought various forms of discovery from the government to further develop their arguments for dismissal of the indictment. The Motion for Discovery contained eight requests. The Magistrate Court (Alexander, J.) denied all of the Pimentals' requests except number four, which relates to the provision of funding by IFB to the USAO.[5] The Pimentals now move this Court to reconsider only those portions of Judge Alexander's decision denying discovery requests. Each request will be summarized in turn as I address the merits of the Pimentals' claims.

## II. *DISCUSSION*

After consideration of the record before me, I must conclude that the government, in fact, did violate Rule 6(e) by disclosing secret grand jury materials to IFB employees.[6] Thus, the Pimentals' motion to reconsider the Magistrate Court's ruling as to discovery request number one is **ALLOWED**. As to the Pimentals' remaining requests, I agree with the Magistrate Court's rulings. Discovery requests two, three, and five through eight are **DENIED**.

4. In relevant part, the Pimentals argue:
 The McCarran–Ferguson Act, 15 U.S.C. § 1012(b), provides, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance . . . ." Here, [Mass. Gen. Laws ch. 152, § 14], prohibits various types of fraud relating to workers' compensation insurance but limits a sentence thereunder to five years. This limit plainly reflects the judgment of the Legislature as to the appropriate maximum penalty for such an offense, as well as its expectation as to the types of sentences that will actually be imposed (i.e., substantially lower). By contrast, the maximum penalty for *each* of the 15 felony counts in this indictment is five years, a prospect the government trumpeted in the press release announcing the Pimentals' indictment.
 Defendants' Memorandum in Support of Their Motion to Dismiss at 10–11.

## A. *Rule 6(e) Violation (Discovery Request No. 1)*

First, the Pimentals requested documents or information relating to the disclosure of Rule 6(e) grand jury material to any person affiliated with IFB, including: Any pleadings, letters, or court orders; identification of the materials disclosed; the date and time of disclosure; and the identities of the persons to whom materials were disclosed. I find that IFB investigators do not fall within the meaning of "government personnel" for purposes of Rule 6(e). It follows that the government violated Rule 6(e) by disclosing grand jury materials to IFB investigators and data analysts. Federal case law persuasively supports this view. Thus, I will **ALLOW** the Pimentals' motion for reconsideration as to discovery request number one.

### 1. *The Parties' Arguments*

According to the Pimentals, the IFB is not a state or local governmental agency, despite its roots in state legislation. If that is true, it follows that IFB investigators are private citizens who do not fall within the "government personnel" exception of Rule 6(e)(3)(A)(ii). Thus, the Pimentals argue that the government should not have disclosed grand jury materials to IFB personnel. More to the point, the government's ex parte motion for disclosure cited cases that do not stand for the proposition that experts who are not within the full-time employ of a government agency may nonetheless qualify as "government personnel."[7] The govern-

5. I will discuss Judge Alexander's rulings with respect to each discovery request when I address the merits of the Pimentals' Motion for Reconsideration.

6. To be sure, I do not find that the Rule 6 violation was "knowing," and therefore, punishable as contempt of court. *See* Fed.R.Crim.P. 6(e)(2). Nor does my holding here imply that the Pimentals suffered prejudice as a result of the Rule 6(e) violation. Defendants still face a long road to dismissal of the indictment. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

7. As discussed below, each of the cases cited by the government in its ex parte application are easily distinguished from the instant case. *See United States v. Sells Eng'g, Inc.,* 463 U.S. 418, 436, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983) [hereinafter *"Sells Engineering "*]; *United States*

ment, they charge, also failed to cite a Tenth Circuit case that directly undermines its motion for disclosure. *See United States v. Tager,* 638 F.2d 167, 170–71 (10th Cir.1980) [hereinafter *"Tager"*].

The government responds that no Rule 6(e) violation occurred because IFB personnel qualify as "government personnel" under Rule 6(e)(3)(A)(ii). According to the government, the *Tager* case is no longer good law. In any event, the government filed its motion in good faith as the Assistant U.S. Attorney was unaware of *Tager* at the time. Finally, assuming *arguendo* that the government violated Rule 6(e), the government argues that the District Court's order of disclosure absolves the government of its mistake.[8]

## 2. *The Magistrate Court's Ruling on Disclosures*

On the motion for discovery, the Magistrate Court correctly recognized that the disclosure of the grand jury materials by the government "raises important questions," and found the question of whether an actual Rule 6(e) violation occurred to be a close call. Most importantly, she noted, the Pimentals concede that the USAO secured an order from the District Court expressly granting the government leave to disclose materials to the IFB. The Magistrate Court found "[i]t is not this Court's place, nor is it within this Court's authority, to second-guess the district court's decision granting disclosure." Beyond that, the Magistrate Court noted that "the defendants have not provided the court with sufficient information to do so despite having possession of the order permitting the disclosure, and the grand jury transcripts and other 'open file' discovery already provided to them by the government." Accordingly, Judge Alexander denied the Pimentals' request.

## 3. *The Rule of Grand Jury Secrecy*

We begin with bedrock criminal procedure. Grand jury proceedings have been closed to the public for centuries, and the rule of grand jury secrecy "is an integral part of our criminal justice system." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218 n. 9, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). Although the justification for grand jury secrecy has evolved over time, the interests served by the rule are well established:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Id.* at 219 n. 10, 99 S.Ct. 1667 (quoting *United States v. Procter & Gamble Co.,* 356 U.S. 677, 681–82 n. 6, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)).

Rule 6(e) codifies the requirement that grand jury activities generally remain secret: "[A]n attorney for the government ... shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules.... A knowing violation of Rule 6 may be punished as a contempt of court." Fed.R.Crim.P. 6(e)(2). The Supreme Court admonishes: "In the absence of a clear indication in a statute or Rule, we must always be reluctant to conclude that a breach of this secrecy has been authorized."

---

*v. Lartey,* 716 F.2d 955, 963 (2d Cir.1983); *United States v. McRae,* 580 F.Supp. 1560, 1562 (D.D.C.1984).

**8.** The government is not required to seek approval from the District Court before making disclosures under Rule 6(e)(3)(A)(ii), as the rule is designed to be self-executing. *Sells Eng'g,* 463 U.S. at 426, 103 S.Ct. 3133. Judge Young aptly

described the government's attempt to secure a court order authorizing (A)(ii) disclosures as "looking for a little 'cover' as it pursues its investigatory responsibilities in conjunction with [IFB] employees." *In re Grand Jury Proceedings,* No. 00–10357, 2000 WL 1678078, at *2 (D.Mass. Nov.1, 2000).

*Sells Engineering,* 463 U.S. 418, 425, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). The Rule recognizes limited exceptions to grand jury secrecy, including an exception for disclosures made to state or federal government personnel:

> Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to ... such government personnel (including personnel of a state or subdivision of a state) as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

Fed.R.Crim.P. 6(e)(3)(A)(ii). Consequently, Rule 6(e) provides that the government should refrain from disclosing grand jury materials to persons outside the control of the government, except as otherwise expressly provided by Rule 6(e)(3).

### 4. *Do IFB Investigators Fall Within the Meaning of "Government Personnel" Under Rule 6(e)(3)(A)(ii)?*

### a. *The IFB Is a Private Investigative Agency*

Undoubtedly, the IFB retains some cloak of official authority, however small, by virtue of its legislative authority. One-third of its board members are public officials. The authorization statute provides for IFB access to some public records that are otherwise unavailable to private investigative agencies. The statute also places some affirmative obligations, general in nature, on the IFB, the insurance bureaus, and insurance carriers for reporting suspected insurance fraud.

It does not follow, however, that the IFB is more appropriately characterized as a governmental agency. To the contrary, the IFB inhabits a region of the private/public spectrum that is much closer to a purely private agency. First, the IFB receives 100% of its budget from private insurance companies. All IFB employees, therefore, receive their salaries directly from the insurance associations (i.e., the AIB and the WCRIB). Second, neither the state of Massachusetts nor the federal government exercises administrative control over the IFB and its policies.[9] The state officials serving on the IFB board cannot exercise control over the IFB; they represent a select minority of board members. *Ellis,* 708 N.E.2d at 647 n. 6. Instead, private interests govern the IFB's operations. Third, IFB investigators do not operate under the control and direction of the USAO or the Commonwealth. *E.g., Commonwealth v. Ellis,* No. 97–1922, 1998 WL 470551, at *5 n. 22 (Mass.Super.Ct. July 31, 1998), *aff'd,* 429 Mass. 362, 708 N.E.2d 644 (1999).

Considering these characteristics of the IFB, the Massachusetts courts have not hesitated to dub the IFB a "private investigative agency." *In re Ellis,* 425 Mass. 332, 680 N.E.2d 1154, 1160 (1997); *Commonwealth v. Ellis,* 1998 WL 470551, at *2. It is quite obvious that the Supreme Judicial Court never doubted IFB's status as a private, nongovernmental agency in *Ellis.* A close reading of *Ellis* discloses that the court presumed the private nature of the IFB throughout its opinion. *E.g., Ellis,* 708 N.E.2d at 653 ("The reimbursement by IFB of an assistant attorney general for his purchase of a computer hard drive and of IFB's other financial assistance to the division directly related to these indictments are more problematic ....").

Despite the Supreme Judicial Court's professed view of the IFB as a "private investigative agency," the First Circuit, in passing, has referred to the IFB as "a quasi-governmental entity." *In re Justices of the Superior Court,* 218 F.3d 11, 13 (1st Cir.2000). The First Circuit's remark has created some confusion as to status of the IFB. *E.g., In re Grand Jury Proceedings,* No. 00–10357, 2000 WL 1678078, at *2 (D.Mass. Nov.1, 2000).[10]

---

**9.** This is especially true with respect to the federal government, which enjoys no representation on the IFB board or among IFB management.

**10.** For example, in reviewing a government motion seeking leave to disclose grand jury materials to the IFB under Rule 6(e)(3)(A)(ii), one member of this Court stated: "It is unclear whether, in fact, the Bureau and its executive directors and employees are 'government personnel' as defined in Rule 6(e)(3)(A)(ii)." *In re Grand Jury Proceedings,* 2000 WL 1678078, at *2 (Young, C.J.). There, the court found it did not have

Until now, the government has escaped thorough judicial oversight of its conduct because of the ex parte nature of grand jury proceedings. Not surprisingly, this District Court's conclusions have been inconsistent, at best.

I have little trouble agreeing with the Supreme Judicial Court that the IFB should be treated as a private agency employing private investigators, rather than as a government agency employing government personnel. It necessarily follows that I find IFB employees are not appropriate recipients of grand jury materials under Rule 6(e)(3)(A)(ii).

I do not believe the First Circuit's characterization of the IFB as "a quasi-governmental agency" affects my Rule 6(e) analysis for several reasons. First, the text of Rule 6(e)(3)(A)(ii) says nothing about "quasi-governmental" personnel. If the drafters of (A)(ii) intended to include non-governmental or quasi-governmental experts within the (A)(ii) exception, presumably the drafters would have used different language to evidence their intent. Thus, were I to find IFB investigators are "quasi-governmental" personnel, they still fall outside the plain meaning of "government personnel."

Second, even if the text of Rule 6(e)(3)(A)(ii) were ambiguous, which it is not, the legislative history of the "government personnel" exception makes clear that IFB investigators do not qualify as "government personnel." *See* "Proposed Amendments to the Federal Rules of Criminal Procedure: Hearings on H.R. 5864 Before the House Subcomm. on Criminal Justice of the House Comm. on the Judiciary," 95th Cong. 92 (1977) (statement of Wayne LaFave, Reporter, Advisory Comm. on Criminal Rules) [hereinafter "Hearings on H.R. 5864"]; S.Rep. No. 95-354, at 6-7 (1977), *reprinted in* 1977 U.S.C.C.A.N. 527, 530. The drafters of (A)(ii) actually considered whether the assistance of private, non-governmental experts should be included. Professor Wayne La-

Fave, speaking on behalf of the drafters, reported the drafters' decision:

[Rep. James Mann:] Along the same line, the rule seems to restrict to other Government personnel the experts—and I will use that term loosely—that the attorney for the Government may call upon.

We have a pretty big Government with a lot of experts, but on certain matters there may not be a governmental employee who is expert in that field.

Is it your intention not to permit the prosecutor to call in an astrologer or astronomer, for example?

Professor LaFave: Yes; that is correct.

Apparently representatives of the Justice department whom we talked to about this particular problem did not seem to think that was a problem, in other words, that there was an occasion when they would need an expert and couldn't find the astrologer some place in the Federal Government.

Hearings on H.R. 5864 at 92. Throughout the legislative history, there is no hint or suggestion that (A)(ii) should be read broadly to include private persons. To the contrary, the history compels my conclusion that the Judicial Conference drafters and Congress intended (A)(ii) to include only personnel employed by governmental departments and administrative agencies.[11]

Third, by broadening the meaning of "government personnel" to include non-governmental experts who remain outside the control and direction of the government, the government vitiates the "rule" of grand jury secrecy. As noted above, Rule 6(e)'s secrecy requirement serves several purposes, including to prevent harm to the reputation of those targeted by the investigation and to protect the grand jury from outside influence. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 219, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). Disclosure, on the other hand, increases the number of persons to

---

occasion to resolve the Rule 6(e) issue as "there is presently no case or controversy before it and any potential dispute concerning disclosure to [IFB] employees is not now ripe for adjudication." *Id.*

11. The examples most often cited by legislators and other participants in the subcommittee hearings are experts employed by the IRS, the SEC, the Treasury Department, and the U.S. Postal Service. *E.g.*, Hearings on H.R. 5864 at 30-31, 35, 86-87.

whom "secret" information is available, thereby increasing the risk of inadvertent or illegal release to third parties. *Sells Engineering*, 463 U.S. 418, 432, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). Thus, the government may thwart Rule 6(e)'s effectiveness if it discloses grand jury materials to non-governmental personnel, such as IFB investigators, who do not operate under the control and direction of the federal government or the Commonwealth.

### b. *Case Law Interpreting Rule 6(e)(3)(A)(ii)*

Federal case law persuasively supports my view that the government violated Rule 6(e) in the instant case. *E.g., Tager*, 638 F.2d 167, 170 (10th Cir.1980); *United States v. Rosenfield*, 780 F.2d 10, 11–12 (3d Cir.1985); *In re November 1992 Special Grand Jury*, 836 F.Supp. 615, 617 (N.D.Ind.1993). Courts reviewing disclosures to persons who are not technically "government personnel" have consistently focused on whether the recipient remained under the control and direction of the government during the relevant time period. *See United States v. Anderson*, 778 F.2d 602, 605 (10th Cir.1985); *United States v. Lartey*, 716 F.2d 955, 964 (2d Cir.1983); *United States v. Thomas*, 593 F.2d 615, 623 (5th Cir.1979); *United States v. McRae*, 580 F.Supp. 1560, 1563 (D.D.C.1984). Here, IFB investigators were never under the control and direction of the USAO so as to meet the narrow "government personnel" exception.

For example, in *Tager*, the Tenth Circuit reversed the defendant's conviction for mail fraud after finding the government violated Rule 6(e)(3)(A)(ii) under circumstances materially indistinguishable from those here. *See* 638 F.2d 167, 170–71 (10th Cir.1980). In that case, the investigation leading to the indictment at issue was initiated by an investigator employed by the Insurance Crime Prevention Institute ("ICPI"). *Id.* at 168. The ICPI was an organization funded by over 300 insurance companies to investigate possible frauds against insurance companies. Similar to the IFB in this case, neither the ICPI nor the investigator were in "any official position whatever." *Id.* The ICPI investigator referred the case to the U.S. Postal Inspection Service for prosecution, and then he continued to assist in the investigation at the government's invitation. When a grand jury was convened, the government moved for disclosure of certain grand jury materials to enable him further to assist in the investigation pursuant to Rule 6(e)(3)(C)(i), which provides for disclosure by court order preliminarily to or in connection with a judicial proceeding. *Id.* A trial judge who heard the motion granted it and ordered the requested disclosure.

After an indictment was returned against the defendant and others, Tager moved to dismiss the indictment on Rule 6(e) grounds. *Tager*, 638 F.2d at 168. The district court expressed misgivings as to whether the disclosure to the ICPI investigator was authorized by Rule 6(e), but found that it was bound by the prior decision of the trial judge who originally authorized the disclosures. *Id.*

On appeal, the Tenth Circuit concluded that the disclosure to the ICPI investigator was not authorized by Rule 6(e). *Id.* at 171. Since the ICPI investigator was "neither a government attorney, government 'personnel,' nor a criminal defendant, subsections (A)(i), (A)(ii), and (C)(ii) are not applicable." *Id.* The court explicitly found the drafters of (A)(ii) considered whether the assistance of private persons like Mr. House [the ICPI investigator] should be included. The drafters decided against such inclusion by limiting (A)(ii) to "government personnel." *Id.* at 170 (citing Hearings on H.R. 5864 at 92); *accord United States v. Rosenfield*, 780 F.2d 10, 11 (3d Cir.1985) (government conceded that ICPI investigator did not fall within the Rule 6(e)(3)(A)(ii) exception). After rejecting the government's Rule 6(e)(3)(C)(i) argument, the Tenth Circuit concluded the district court was "without authority" to order disclosure to the ICPI investigator to assist the ongoing grand jury investigation. *Tager*, 638 F.2d at 171.

I find the Tenth Circuit's reasoning persuasive; it squarely addresses the four corners of the Rule 6(e) question in this case. Indeed, the government has not cited a sin-

gle case that repudiates *Tager*'s holding on Rule 6(e)(3)(A)(ii).[12]

The government argues *Tager* has been undermined by the Tenth Circuit in *United States v. Anderson*, 778 F.2d 602, 605 (10th Cir.1985).[13] That is not so. In *Anderson*, the government retained a professor to testify before the grand jury as an "expert witness" on trust law.[14] The witness was "under contract with the government" at the time of disclosure. *Id.* The Tenth Circuit found the facts of *Anderson* to be similar to the Second Circuit's *Lartey* decision (discussed below), and reversed the district court's order dismissing the indictment.

In reaching that conclusion, the Tenth Circuit explicitly found "[t]he facts in *Tager* are far different from the present facts." *Anderson*, 778 F.2d at 605. "In *Tager* the disclosure involved grand jury transcripts, not preexisting promotional materials. The person to whom disclosure was made was a nontestifying investigator and was not in any sense in the employ of the government, and the prosecution, not the grand jury, made the request for disclosure." *Id.* at 605 n. 1. The Pimentals' case, unlike *Anderson*, involves a prosecutor-initiated disclosure of grand jury materials to both testifying and non-testifying private investigators and data analysts, none of whom were in the employ of the state or federal government.

The government relies on other cases that are, like *Anderson*, materially different than the Pimentals' case.[15] For example, the government cites dicta in *Sells Engineering* for the following proposition: "Rule 6(e)'s 'government personnel' exception was adopted to meet Justice Department attorneys' need for 'active assistance from outside personnel—not only investigators from the FBI, IRS, and other law enforcement agencies, but also accountants, handwriting experts, and other persons with special skills.'" Government's Motion for Leave at 4 (quoting *Sells Engineering*, 463 U.S. at 436). Read in context, however, the quoted passage plainly does not imply that Rule 6(e)(3)(A)(ii) includes non-governmental personnel within its exception for "government personnel." Rather, the Supreme Court noted only that Justice Department attorneys often require expert assistance from government personnel employed by government agencies other than

---

**12.** Though the First Circuit has not adopted the *Tager* holding, I am not aware of any First Circuit case that undermines the *Tager* reasoning.

**13.** In its Opposition to Defendants' Motion to Dismiss, the government also relies on *United States v. Benjamin*, 852 F.2d 413 (9th Cir.1988) [hereinafter *"Benjamin"*], to argue that the reasoning of *Tager* has been subsequently undermined. As an initial matter, I note that the Supreme Court vacated *Benjamin*, so that case does not remain good law. *Benjamin v. United States*, 490 U.S. 1043, 109 S.Ct. 1948, 104 L.Ed.2d 418 (1989). Also, even if the *Benjamin* decision were good law, its holding is not on-point. There, the Ninth Circuit upheld disclosures to a non-governmental expert under Rule 6(e)(3)(C)(i)—not under Rule 6(e)(3)(A)(ii)—where disclosure is ordered by a court on "a strong showing of particularized need." *Benjamin*, 852 F.2d at 419. The Ninth Circuit's reasoning does not support the government's view that private investigators fall within the "government personnel" exception of Rule 6(e)(3)(A)(ii).

Moreover, the government did not move for disclosure on Rule 6(e)(3)(C)(i) grounds, nor does it defend its actions on (C)(i) grounds in its opposition to the motion to dismiss. It never made a "strong showing of particularized need" in the first instance. In any event, on this record, the government is not likely to succeed even

**14.** The grand jury requested some materials, which were promulgated to the general public by defendants. Some of the materials were shown to the retained expert witness, and he testified before the grand jury concerning them. Thus, in *Anderson*, Rule 6(e) might not have applied at all because the disclosed materials constituted "business records or similar documents 'created for purposes independent of grand jury investigations, which have legitimate uses unrelated to the substance of the grand jury proceedings.'" *Church of Scientology Int'l v. United States Dep't of Justice*, 30 F.3d 224, 235 (1st Cir.1994) (quoting *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1412 (9th Cir.1993)).

**15.** The government's motion cited three cases for the proposition, "[a]s insurance fraud experts deemed necessary by the undersigned attorney for the government to assist in the federal investigation, [IFB] investigators are 'government personnel' within the meaning of Rule 6(e)(3)(A)(ii)." *See Sells Engineering*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983); *United States v. Lartey*, 716 F.2d 955 (2d Cir.1983); *United States v. McRae*, 580 F.Supp. 1560 (D.D.C.1984).

if it argued the point on Rule 6(e)(3)(C)(i) grounds. *See In re November 1992 Special Grand Jury*, 836 F.Supp. 615, 618 (N.D.Ind.1993).

the Justice Department.[16]  *Id.* at 436, 103 S.Ct. 3133.

The government also points to *United States v. Lartey,* 716 F.2d 955 (2d Cir.1983). There, the Second Circuit upheld disclosure to a former IRS investigator who was retained by the USAO to assist a grand jury investigation.  *Id.* at 963.  The retained expert in *Lartey,* unlike the IFB investigators here, "was employed exclusively by the government" during the period he had access to grand jury materials.  *Id.* The Second Circuit concluded that the expert, "who worked exclusively for the government during the Lartey investigation and trial, providing it with expertise not possessed by permanent employees of the United States, fell within the 'government personnel' exception to Rule 6(e)."  *Id.* at 964.  In contrast to *Lartey,* the government does not claim the IFB investigators were temporarily employed by the government, or otherwise under its control.

Finally, the government cites *United States v. McRae,* 580 F.Supp. 1560 (D.D.C. 1984).  In *McRae,* the district court upheld the USAO's disclosure of grand jury materials to a District of Columbia police detective.  *Id.* at 1562.  At the time of *McRae,* Rule 6(e)(3)(A)(ii) did not expressly authorize disclosures to governmental personnel "of a state or subdivision of a state."  The district court held that, even if state police officers did not fall within the meaning of "government personnel," a D.C. police officer qualified as "government personnel" because of the unique relationship between the federal government and the District of Columbia. In short, the court found that members of the D.C. Police Department were government personnel under Rule 6(e)(3)(A)(ii) because they act "under the control and direction of the United States Attorney."  *Id.* at 1563.  By contrast, Faragi and the other IFB investigators do not act under the control and direction of the USAO or any other

governmental agency.  *McRae,* like all of the cases cited by the government, does not support the government's theory that non-governmental personnel, employed by the IFB, fall within the "government personnel" exception to the rule of grand jury secrecy.

**5.  *Discovery Remedy for the Rule 6(e) Violation***

I find the Pimentals are entitled to discovery to determine the scope and possible impact of the Rule 6(e) violations.  The government has not raised any potential damage that may arise if the Pimentals acquire the requested information.  Accordingly, the Pimentals' first discovery request is ALLOWED.  The government shall produce the requested information by March 16, 2001.

**B.  *Impersonation of Police Officers (Discovery Request Nos. 2–3)***

Discovery requests two and three seek information supporting the Pimentals' claim that IFB investigators misrepresented themselves to witnesses in violation of Massachusetts law prohibiting impersonation of law enforcement officers.  Thus, the Pimentals moved for all IFB policies, guidelines, and procedures for interviewing witnesses, as well as all IFB policies, guidelines, and procedures for requesting documents from witnesses.

The Magistrate Court denied the Pimentals' second and third requests because the Pimentals already possess sufficient evidence from which to develop this claim (i.e., a list of all the witnesses interviewed), yet they assert no evidence of an actual violation of the Commonwealth's laws.  I wholeheartedly agree with the Magistrate Court.  Assuming *arguendo* that the IFB investigators violated the Commonwealth's laws, the Pimentals assert no legal authority supporting their claim

---

**16.**  Indeed, the Supreme Court did not decide *Sells Engineering* on Rule 6(e)(3)(A)(ii) grounds. In that case, the government had moved for disclosure of grand jury materials to attorneys in the Justice Department's Civil Division, their paralegal and secretarial assistants, and certain Defense Department experts, for use in preparing a civil suit against targets of a criminal fraud and tax evasion investigation.  *Sells Eng'g,* 463 U.S. at 421, 103 S.Ct. 3133.  The Supreme Court found such access to grand jury materials permissible only when the government moves for court-ordered disclosure under Rule 6(e)(3)(C)(i) and makes a showing of particularized need as required by that Rule.  *Id.* at 420, 103 S.Ct. 3133. The case is largely irrelevant for our present purposes.

that the indictment should be dismissed. Discovery requests two and three were properly **DENIED**.

### C. Indictment Foreclosed by the McCarran–Ferguson Act (Discovery Request Nos. 5–6, 8 )

Discovery requests five, six, and eight apply both to the disinterested prosecutor and McCarran–Ferguson Act claims.[17] The Pimentals requested: (5) All documents reflecting policies for determining whether to refer a matter for prosecution, and, in the event of referral, which of the prosecuting authorities a matter should be referred to; (6) all documents or information reflecting the USAO's policies for accepting or rejecting IFB criminal referrals; and (8) all documents relating to IFB policies, guidelines, or procedures for assisting in the implementation of a civil remedy provided by Massachusetts General Laws chapter 152, section 25(c)(9).

The Magistrate Court correctly denied discovery requests based on the Pimentals' McCarran–Ferguson Act claim. Their argument is futile. Federal courts have unanimously held that federal mail fraud prosecutions are not barred by the McCarran–Ferguson Act. *E.g., United States v. Blumeyer,* 114 F.3d 758, 768 (8th Cir.1997); *United States v. Cavin,* 39 F.3d 1299, 1305 (5th Cir.1994); *United States v. Sylvanus,* 192 F.2d 96, 100 (7th Cir.1951). Also, the Magistrate Court correctly noted that the Supreme Court's decision in *Humana Inc. v. Forsyth,* 525 U.S. 299, 306–11, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999), confirms the reasoning of those circuit decisions cited above. On the basis of the McCarran–Ferguson Act claim, the motion for reconsideration is **DENIED** as to discovery requests five, six, and eight.

---

17. Although defendants argued for request numbers five, six, and eight in connection with their McCarran–Ferguson argument for dismissal, the Magistrate Court found some of these requests more relevant to defendants' disinterested prosecutor claim. I agree with the Magistrate Court on this score and will address these claims accordingly.

### D. Disinterested Prosecutor (Discovery Request Nos. 5–8)

Discovery requests five through eight are relevant to the Pimentals' disinterested prosecution claim.[18] In addition to the information requested in connection with the McCarran–Ferguson Act claim, which I have already addressed, the Pimentals' seventh request seeks all documents or information reflecting whether any alleged victim in this case contributed, directly or indirectly, to funding or other support for IFB. The Magistrate Court denied all of these requests, with the caveat that defendants could make such additional requests in the future if the court-ordered discovery produced evidence of a financial link between the USAO and the IFB or a private company.

Given my findings above, I will presume that the IFB is not disinterested. But more to the point, the IFB is not a "prosecutor" at all. Defendants point to no evidence whatsoever that the IFB or a private insurance company made any decision on behalf of the prosecution in this case. Also, the relationship between the USAO and the IFB exhibits none of the intimacy that exists between the IFB and the Commonwealth's Office of the Attorney General. *See Ellis,* 429 Mass. 362, 708 N.E.2d 644, 652–54 (1999). Thus, the discovery requested in numbers five through eight is irrelevant to determining whether the USAO remains a disinterested prosecutor in this case. The Pimentals' motion for reconsideration as to these requests is **DENIED**.

### III. CONCLUSION

For the reasons stated above, the Pimentals' motion for reconsideration of the Magistrate Court's ruling on discovery is **GRANTED** as to discovery request number one and **DENIED** as to all other requests. I **ORDER** the government to produce the Rule 6(e) discovery by **March 16, 2001**. The Pi-

---

18. Request number four also concerned the Pimentals' disinterested prosecutor argument. To this end, they demanded all documents or information relating to any provision of funding, assistance, or any other thing of value by IFB to the USAO or FBI or any other federal agency in connection with the investigation or prosecution.

mentals shall file any necessary supplementary briefs in support of their motion to dismiss no later than **April 6, 2001.** The government has until **April 10, 2001** to file a supplementary reply brief.

**SO ORDERED.**